**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) ) | Chapter 15 |
| Asbestos Corporation Limited,[1] | ) ) | Case No. 25-_____ (   ) |
| Debtor in Foreign Proceeding. | ) ) ) | |

**DECLARATION OF AYMAN CHAABAN**
**PURSUANT TO 28 U.S.C. § 1746**

      I, Ayman Chaaban, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

      1.      I am an individual over 21 years of age and am competent to testify and to provide this declaration (the "**Declaration**") in support of (I) the Chapter 15 Petition for Recognition of Foreign Proceeding (Official Form 401) (the "**Petition**") [ECF No. 1] and the *Verified Petition and Motion of the Foreign Representative for (A) Recognition of the CCAA Proceeding as a Foreign Main Proceeding or, in the Alternative, as a Foreign Nonmain Proceeding, and (B) Certain Related Relief* filed concurrently therewith (together with the Petition, the "**Verified Petition**"),[2] and (II) the *Motion for (i) Ex Parte Relief and (ii) Provisional Relief Pursuant to 11 U.S.C. §§ 1519, 362 and 105(a)* (the "**Motion for Provisional Relief**"), both of which are concurrently filed herewith.

      2.      I am a Partner of Raymond Chabot Inc. ("**RCI**"), the court-appointed monitor of the Debtor (in such capacity, the "**Monitor**") and the duly authorized foreign representative of the Debtor.

---

[1] The Debtor in this chapter 15 case, along with its unique identifier, is Asbestos Corporation Limited (Canadian Federal Business Number: 104903273RC0001). The Debtor has a registered and business address in Canada of 840 Boul. Ouellet, Thetford Mines, QC G6G 7A5, Canada.

[2] Except as otherwise indicated, capitalized terms used herein carry the meanings ascribed to them in the Verified Petition.

1

3. I have worked in the insolvency and restructuring group at RCI since 2010. I hold a BBA in Business Administration from HEC Montréal, and a Graduate Diploma in Public Accounting from HEC Montréal. Additionally, I am a member of several professional associations. I have been a member of the Order for Chartered Professional Accountants (the Québec CPA Order) since 2015. I have also been a member of the Canadian Association of Insolvency and Restructuring Professionals since 2013. Moreover, since 2015, I have been a Licensed Insolvency Trustee (LIT).

4. I make this Declaration on the basis of documentation in my possession or supplied to me and on facts and matters that are known to me or of which I have been informed by others. Where I have been informed by others, the information is true to the best of my knowledge and belief.

5. On May 5, 2025, CLMI (defined below) filed an *Application for the Issuance of a First Day Initial Order and an Amended and Restated Initial Order* (the "**Initial Application**"), a true and correct copy of which is attached hereto as **Exhibit 1**, in the Canadian Court, initiating insolvency proceedings under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended (the "**CCAA**") for the above-captioned debtor, Asbestos Corporation Limited (the "**Debtor**" or "**ACL**"), which is currently pending before the Superior Court of Québec (the "**Canadian Proceeding**," and such court, the "**Canadian Court**").

6. Prior to submitting the Initial Application, I submitted for the Canadian Court's consideration a Pre-Filing Report, a true and correct copy of which is attached hereto as **Exhibit 2**.

7. The Canadian Court granted CLMI's requests and, by orders dated May 6, 2025 (the "**Canadian Orders**")[3] granted the Debtor certain relief under the CCAA and appointed RCI as Monitor and the "foreign representative" authorized to apply for recognition of the Canadian Proceeding as a foreign proceeding within the United States. *See* Ex. 3 ¶ 62. As part of the Canadian Orders, the Canadian Court ordered that the Debtor possess and control its present and future assets, rights, undertakings and properties of every nature and kind whatsoever, including all proceeds thereof, all bank accounts and all insurance assets, wherever they may be located, including in the United States, subject to the powers the Canadian Orders simultaneously granted to the Monitor. *See id.* at 15.

A.  **The Debtor's business and operations**

8. ACL is a Québec corporation and it has been located in the Province of Québec, Canada, for nearly a century. ACL's. ACL was founded in 1925 and was incorporated under the laws of Canada with its principal place of business is located in the Province of Québec, Canada. *See* Ex. 1 ¶ 129; Ex. 2 ¶ 2.1. ACL is regulated under the Canada Business Corporations Act and is a reporting issuer in the provinces of Québec, Alberta, British Columbia and Ontario, with Québec being ACL's principal jurisdiction. *See* Ex. 2 ¶ 2.2. ACL is a subsidiary of Mazarin Inc. ("**Mazarin**"), which holds a majority of ACL's shares. *Id.* ¶ 2.3. Robert Tremblay and the Estate of Monette Serge are minority shareholders of ACL.

9. ACL is a publicly listed entity trading in Canada on the Toronto Stock Exchange (TSX Venture Exchange). *See* Ex. 1, ¶ 26. In addition to its operations and debt, ACL raises its funds from share capital issuances in Canada and uses such capital raises to fund its activities.

---

[3] True and correct copies of the Canadian Orders are attached to the Petition and also attached hereto as **Exhibit 3**.

10. ACL's board consists of 6 members. *See* Ex. 2 ¶ 7.1.3. ACL's board meetings have been held exclusively in Canada for several years.

11. The registered, head office and chief place of business of ACL and the headquarters office of ACL is in Québec, Canada. *See id.* ACL's operational and critical strategic decisions are mainly made in Québec, by senior management of ACL, also located in Québec. *See id.* ACL's books and records are located and maintained at ACL's headquarters in Québec. *See id.*

12. All directors or officers of ACL have places of residence in Canada and work in Canada. *See id.* All of ACL's bank accounts are located in Canada. *See id.* ¶ 7.1.6. ACL's current mining, real estate, and alternative energy development operations each take place exclusively in Canada. ACL's tangible assets and operations are located in Québec, Canada. *See* Ex. 1 ¶ 91, 129(j).

13. ACL currently has approximately 6 employees, all of whom are based in Canada. *See id.* ¶ 36.

14. ACL owns eight (8) mines, all of which are located in Québec. Canada is the location of ACL's primary assets, including its remaining mines, leases, and all of its equipment and other personal property. *See id.* ¶ 31.

15. For a period of sixty years, ACL operated open pit chrysotile mines for the purpose of asbestos mining in Québec. *See* Ex. 2 ¶¶ 2.6, 2.7 . Although ACL stopped mining for asbestos in the 1980s, it continues to operate the mines for purposes of extracting minerals from serpentinite, the waste material remaining after mining. *See id.* ACL also continues to manage, restore, lease and redevelop its properties, including various warehouses and other buildings, all of which are in Québec, Canada. *See id.* ¶ 2.7. ACL is also reportedly exploring the exploitation

of new energy sources, such as wind and solar power, and the potential for carbon dioxide capture and sequestration from the carbon dioxide emitted from its remaining mining operations. *See id.*

16. Aside from the operations described above, ACL's activities involve managing litigation it faces as a result of its historical asbestos mining operations. *See* Ex. 1 ¶ 33. Thousands of personal injury lawsuits have been filed against ACL by people claiming bodily injury resulting from exposure to asbestos fiber or to asbestos-containing products allegedly connected to ACL. *See id.* ¶ 3; Ex. 2 ¶ 2.46. ACL has also been named in a lawsuit asserting a $151 million indemnity claim that was filed by the Trustee of the bankruptcy trust of National Service Industries, Inc., a former participant in the asbestos market. These product liability, personal injury and indemnity lawsuits pose a significant financial and operational burden to ACL. As explained below, while ACL is party to insurance contracts that help defray the cost of liability and defense of these lawsuits, the fact that these claims are proceeding in a multitude of jurisdictions places an untenable strain and expense on the Debtor and its available insurance coverage. Further, the non-recurring nature of some of its revenue creates additional risk and uncertainty with respect to ACL's liquidity. *See* Ex. 1 ¶ 35; Ex. 2 ¶ 2.9.

17. ACL lacks a United States domicile or place of business. However, the Debtor has paid an attorney retainer fee of $300,000 to Orrick, Herrington & Sutcliffe, LLP, a New York law firm which is acting as United States Counsel to RCI in its capacity as Foreign Representative. The retainer fees are held in Orrick's client trust account at Citibank Private Bank in New York, where they shall remain pending the final billing in this proceeding.

18. By initiating the Canadian Proceeding along with the Debtor, a number of ACL's insurers that subscribed to one or more of the excess liability insurance policies under which ACL

was insured or allegedly insured (collectively, "**CLMI**")[4] sought to bring order to the process of resolving these mass tort claims against the Debtor that are multiplying across jurisdictions and threatening to drive it deeper into insolvency. Rather than allowing litigation to proceed piecemeal, the Canadian Proceeding will provide an avenue for the Debtor to channel those liabilities into a single forum where they can be equitably and efficiently resolved.

19. Through the Canadian Proceeding, ACL, in consultation with CLMI, intends to seek an order approving a claims process (the "**Claims Process**"), which will establish the procedures relating to the determination and adjudication of claims against ACL (the "**Claims Process**"). *See* Ex. 1 ¶ 21; Ex. 2 ¶¶ 3.1, 3.2. As part of this Claims Process, the parties intend to establish a creditors' committee, consisting of ACL's insurers, who will assist the Debtor and the Monitor in the review and resolution of any claims filed in the context of the Claims Process, as well as approve any settlement in connection therewith. *See.* Ex. 1 ¶ 21.

### B. Assets, Liabilities and Capital Structure

20. ACL's limited employees, operating assets and operations are located in Québec, Canada. *See id.* ¶ 19.

21. ACL has one main secured creditor, its parent company, Mazarin, to which ACL owes approximately $26,729,000 in Canadian dollars, in respect of certain notes issued by ACL as reflected in the unaudited interim financial statements dated as of September 30, 2024. *See id.*

---

[4] The insurers that initiated the Canadian Proceeding include Certain Underwriters at Lloyd's, London, Tenecom Limited (as successor to Winterthur Swiss Insurance Company, formerly known as Accident & Casualty Insurance Company of Winterthur, Switzerland, and to Yasuda Fire and Marine Insurance Company (UK) Limited and now known as Tenecom Ltd.), The Ocean Marine Insurance Company (as successor to liabilities of Commercial Union Assurance Company Limited, The Edinburgh Assurance Company, The Indemnity Marine Assurance Company Limited, The Northern Assurance Company Limited, The Road Transport & General Insurance Company Limited, United Scottish Insurance Company Limited, and The Victoria Insurance Company Limited), NRG Victory Reinsurance Limited, as successor to liabilities of New London Reinsurance Company Limited and The Scottish Lion Insurance Company Ltd., a company having its Registered Office at Suite 1, South Inch Business Centre, Shore Road, Perth, Scotland, PH2 8BW.

¶ 41 .   Like ACL, Mazarin is a publicly listed Canadian entity located in Canada and trades in Canada on the Toronto Stock Exchange.  *See id*. ¶ 26.

22.     The notes held by Mazarin are secured by a mortgage on certain real property located in Canada (called an "immovable hypothec" under Québec law) up to the principal amount of $70,000,000 in Canadian dollars.  *See id*. ¶ 42.

23.     ACL's unsecured debt consists of accounts payable and accrued liabilities with a total book value in Canadian dollars of approximately $2,381,000, of which approximately $1,849,000 consists of fees and compensation related to ongoing litigation, and $532,000 of trade payables and accrued expenses owed.  *See id*. ¶ 46.

24.     As of December 31, 2024, the Debtor's declared indebtedness for litigation-related liabilities had a total book value in Canadian dollars of approximately $29,413,000, consisting of approximately $3,284,000 in amounts currently owed due to the litigation in the U.S. and $26,129,000 of non-current liabilities.  *See* Ex. 2 ¶ 2.46.

25.     ACL offers a defined benefit plan that guarantees the payment of post-retirement benefits to some of its employees and former employees.  *See* Ex. 1 ¶ 54.  The defined benefit plan was closed to new members of December 2023.  *Id*.  ACL also offers life insurance to some of its former employees.  *Id*.

C.     **Need for Organized Process for Resolving Asbestos Claims**

26.     Since ACL ceased its mining operations in the 1980s, it has faced several thousands of litigation claims related to exposure to asbestos.  *See* Ex. 1 ¶ 3.  ACL continues to be a defendant in thousands of currently pending asbestos personal injury lawsuits.  Those cases are pending in at

least 14 states, including New York, California, Illinois, Louisiana, Washington, Indiana, Michigan, Minnesota, South Carolina, Connecticut and Delaware.[5]

27.     Nearly thirty years ago, ACL, CLMI[6] and ACL former indirect majority owner, General Dynamics entered into an Interim Settlement Agreement regarding responsibility for managing the defense of asbestos-related bodily injury claims and lawsuits against ACL and payment of defense costs and settlements and judgments of those asbestos-related liabilities under the London Policies.[7] This protocol was embodied in a settlement agreement dated August 24, 1998 (the "**Interim Settlement Agreement**" or "**ISA**").[8] The ISA sets forth an arrangement among the parties thereto by which CLMI, under the London Policies in effect from 1976 to 1982, shall reimburse ACL for their shares of amounts paid by ACL for Defense Costs and Indemnity Payments attributable to Asbestos-Related Bodily Injury Claims (as such terms are defined in the ISA). The ISA also provided a mechanism for allocating defense costs and indemnity payments with respect to asbestos related bodily injury claims asserted against ACL. The effective term of

---

[5] A list of plaintiffs that have commenced currently litigation against ACL is attached to the Petition.

[6] Certain Underwriters at Lloyd's, London, The Scottish Lion Insurance Company Limited, Tenecom Limited (as successor to Winterthur Swiss Insurance Company, formerly known as Accident & Casualty Insurance Company of Winterthur, Switzerland, and to Yasuda Fire and Marine Insurance Company (UK) Limited and now known as Tenecom Limited), The Ocean Marine Insurance Company Limited (as successor to liabilities of Commercial Union Assurance Company Limited, The Edinburgh Assurance Company, The Indemnity Marine Assurance Company Limited, The Northern Assurance Company Limited, The Road Transport & General Insurance Company Limited, United Scottish Insurance Company Limited, and The Victoria Insurance Company Limited), and NRG Victory Reinsurance Limited, as successor to liabilities of New London Reinsurance Company Limited, (collectively, "**CLMI**") and the Debtor (together with CLMI, the "**Applicants**"), initiated the CCAA Proceeding.

[7] From 1969 through 1982 General Dynamics held an indirect ownership interest in ACL. During the period from July 1, 1969 through July 1, 1982 (the "**Policy Period**") certain general liability insurance policies were issued in favor of General Dynamics. Among those were certain excess policies (the "**London Policies**") subscribed to severally (not jointly) by CLMI. The London Policies, subject to their terms, conditions and limits of liability, provided defense cost and indemnification reimbursement coverage to General Dynamics and, commencing on April 1, 1973 of the Policy Period, to ACL. The London Policies in effect during the period in which the bodily injury took place are triggered rather than the policies in effect on the date that a claim is asserted. As ACL was an assured or alleged insured from April 1, 1973 through the end of the Policy Period of the London Policies, it remains an insured or alleged insured entity under the London Policies with respect to injuries allegedly occurring during the Policy Period even though it is no longer a subsidiary of General Dynamics.

[8] The ISA has a New York choice of law provision and a New York arbitration venue provision.

the ISA Agreement has been extended on multiple occasions, with the most recent extension making it effective for an indefinite term.

28. Thousands of claims were settled using this protocol. *See* Ex. 1 ¶ 62. However, ACL's ability to resolve claims has been complicated by the recent appointment of a receiver over ACL by the Court of Common Pleas of Richland County (the "**South Carolina Court**"). *See id*. ¶ 11. On September 8, 2023, the South Carolina Court entered an order (the "**Receivership Order**") appointing Mr. Peter D. Protopapas as receiver of ACL (the "**Receiver**"), with broad powers, including the power to engage defense counsel for asbestos suits against ACL, assume exclusive control of asbestos lawsuits against ACL pending in the United States, and administer ACL's insurance assets with respect to these asbestos lawsuits.[9] A true and correct copy of the Receivership Order is attached hereto as **Exhibit 6**. The South Carolina Court did so upon finding that ACL should be sanctioned for (a) asserting a personal jurisdiction defense in that litigation and (b) arguing that the Québec Business Concerns Records Act (the "**QBCRA**"), a "blocking statute" that prohibits Québec corporations from producing its documents outside of Québec in foreign proceedings, constrained ACL's ability to respond to discovery and deposition requests propounded in a single U.S. lawsuit (the "*Tibbs* **Action**").

29. The existence of the receivership has resulted in several resource-intensive appeals and related disputes, including an appeal currently pending before the Supreme Court of South

---

[9] The Receivership Order is not the first of its kind. The South Carolina Court has appointed Mr. Protopapas as receiver for other entities, including foreign debtors, at least twenty four times in the last five years. *See* **Exhibit 4** hereto, Pet. for Writ of Prohibition 6, *Certain Underwriters at Lloyd's, London vs. Hon. Jean H. Toal,* Case No. 24-07284 (S.C. Sup. Ct. Dec. 17, 2024). On December 11, 2024, the High Court of Justice Business and Property Court of England and Wales (the "**UK Court**") rejected the South Carolina Court's claim of jurisdiction over a Cape Plc ("**Cape**"), whose corporate predecessor mined asbestos in South Africa and never did business in South Carolina, finding that the Receiver had no authority to act on behalf of Cape. The UK Court then ordered the South Carolina Receiver pay a penalty of $1 million British pounds, equivalent to $1.3 million USD, and indicated that it would impose criminal sanctions on the South Carolina Receiver if he continued to assert authority over Cape. The Judgment of the UK Court is attached as **Exhibit 5** hereto.

Carolina over whether Mr. Protopapas's appointment as receiver in the *Tibbs* Action was proper under South Carolina law.[10] But that appeal has not stayed the Receivership Order or ongoing and new asbestos litigation against ACL.

30.     Meanwhile, since his appointment, the South Carolina Receiver has taken steps that resulted in increased liability and damages for ACL, rather than protecting ACL's interests and those of its stakeholders. The South Carolina Receiver has refused to abide by the ISA, by settling claims for excessive amounts that ACL has not consented to.[11] The Receiver has, moreover, made damaging statements that are likely in direct contravention of the Receiver's duty to protect the Debtor's interests and pose additional risk to the Debtor, as parties may seek to use them as admissions against the Debtor's interests and, if deemed admissions of the Debtor, will jeopardize and potentially void the Debtor's coverage under the London Insurance Policies.[12]

31.     At the same time, ACL continues to face litigation and exposure to the risk of default judgments without regard to the merits of the plaintiffs' claims—a risk that the receivership has only exacerbated. The South Carolina Receiver has accepted service of multiple new asbestos actions purporting to act on ACL's behalf, but ACL has declined to retain counsel in such cases, as it does not recognize the South Carolina Receiver as valid. As a result of these gaps in legal representation, ACL has been exposed to the risk of default judgments, which in turn could deplete the finite insurance assets. Even apart from disputes over the retention of counsel, the South Carolina Receiver's appointment has done nothing to stop the risk of sanctions or defaults resulting

---

[10]*Tibbs vs.* 3M Co., Case No. 2023-001461 (S.C. Sup. Ct.).

[11]The five South Carolina settlements recommended by the Receiver represent more than 5% of the total amount that CLMI have paid to ACL, over multiple decades, as reimbursement for CLMI's share of ACL's indemnity and defense costs. And the average of those five South Carolina settlements for ACL was 45 times higher than ACL's nationwide settlement average in 2023. *See* Pet. for Writ of Prohibition 43, *Certain Underwriters at Lloyd's, London vs. Hon. Jean H. Toal*, Case No. 24-07284 (S.C. Sup. Ct. Dec. 17, 2024).

[12] *See* **Exhibit 7,** Return on Writ of Prohibition 3, 5, 18, *Certain Underwriters at Lloyd's, London vs. Hon. Jean H. Toal*, Case No. 24-07284 (S.C. Nov. 27, 2024).

from ACL's reliance on the QBCRA to resist discovery. Plaintiffs continue to file motions to compel and for sanctions against ACL even in the Receiver-defended cases in South Carolina.

32. Moreover, in *Kotzerke v. 3M Company et al.*,[13] a Washington state court struck ACL's responsive pleading and entered a default judgment against ACL as a discovery sanction, after ACL unsuccessfully invoked the QBCRA as limiting its ability to produce documents from Québec or present a corporate deponent to testify about the Québec documents. Absent a supersedeas bond, which ACL is not in a position to provide, that judgment (the "**Washington Judgment**") in the amount of USD $16,219,398.25 is presently enforceable and unstayed. A true and correct copy of the Washington Judgement is attached hereto as **Exhibit 8**. This substantial monetary judgment is not directly related to the merits of the underlying claim,[14] but rather, is related to ACL's defenses being struck as purported punishment for ACL's lack of cooperation in discovery based on its adherence to the QBCRA in Québec. Yet, the end result is that if CLMI pays this excessive judgment, it will deplete the finite resources available to current and future claimants.

33. ACL is also now in jeopardy of having its defenses struck and being held in default in a California lawsuit, in which it has already been held in contempt and sanctioned not producing documents and witnesses from Québec based on its adherence to the QBCRA.[15] As a result, ACL again is in jeopardy of being held in default and subject to an excessive judgment not based on the merits of the case, but rather on its respect of the QBCRA, the law of ACL's home jurisdiction that subjects ACL to potential civil and criminal penalties if violated.

---

[13] Case No. 23-2-05287-6 (Pierce County, Wa. Super. Ct.).
[14] On March 3, 2025, there was a hearing on damages, at which the ACL was precluded from disputing causation or plaintiff's alleged damages. Therefore, the results of the damages hearing were not based upon the merits, but to punish ACL for relying on the QBCRA.
[15] *Smalley v. 3M Co.,* Case No. 23STCV17189 (Los Angeles County, Cal. Sup. Ct.).

34. The Debtor requires protection from ongoing, asbestos-related litigation across multiple jurisdictions in the United States—the defense of which has now been complicated by the by the South Carolina Receiver's appointment—as well as actions brought directly against CLMI, the Debtor's insurer. *See* Ex. 1 ¶¶ 7, 11, 49. Indeed, the South Carolina Receiver has already sued CLMI in South Carolina to force CLMI to pay the South Carolina Receiver's costs and other creditors have taken action against certain of the Debtor's insurers to enforce judgments against ACL.

35. Separately and collectively, this local litigation will undermine the Debtor's restructuring efforts by diverting attention and resources away from the centralized Canadian Proceeding.

36. The finite amount of insurance proceeds available to pay claims makes the inequitable treatment of creditors even more likely in these circumstances, as any amount paid pursuant to a lawsuit directly reduces the limits available to pay other claims.

37. It is critical that the stay be extended to cover CLMI and its third party administrator Resolute in addition to the Debtor to prevent irreparable harm. If a stay is not granted, ACL's potential liability will continue to increase exponentially as litigation progresses against the Stay Parties in a growing number of different jurisdictions.

38. Without relief in the form of recognition and an automatic stay, this uncontrolled piecemeal litigation will continue to deplete ACL's available insurance assets. As ACL has recognized, all creditors and parties in interest would be better served by a collective proceeding in ACL's home jurisdiction, where it has always conducted its business, where it can lawfully produce its business records to its Canadian court appointed Monitor in full compliance with Canadian law and where the South Carolina Receiver poses no obstacle to ACL's resuming an

effective, efficient, cost-effective and transparent process of resolving claims under court supervision.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 6, 2025
Québec, Canada

*/s/ Ayman Chaaban*_____
Ayman Chaaban