**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>   ASBESTOS CORPORATION LTD.,<br><br>   Debtor in a Foreign Proceeding. | **FOR PUBLICATION**<br><br>Case No. 25-10934 (MG)<br><br>Chapter 15 |

### MEMORANDUM OPINION GRANTING MOTION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND ADDITIONAL RELIEF AND OVERRULING ASBESTOS PARTIES OBJECTIONS

*A P P E A R A N C E S :*

ORRICK, HERRINGTON & SUTCLIFFE LLP
*Counsel for the Petitioner Raymond Chabot Inc., in its capacity as Foreign Representative*
51 West 52nd Street
New York, New York 10019
By:    Evan Hollander, Esq.
       Daniel A. Rubens, Esq.
       David Litterine-Kaufman, Esq.
       Michael Trentin, Esq.
       Jenna MacDonald Busche, Esq.
       Daniel Carnie, Esq.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004
By:    Andrew D. Velez-Rivera, Esq.

DENTONS US LLP
*Counsel to TIG Insurance Company and certain other insurance companies*
1221 Avenue of The Americas, 25th Floor
New York, NY 10020
By:    Geoffrey M. Miller, Esq.

MORGAN LEWIS & BOCKIUS LLP
*Counsel for Peter D. Protopapas, the Court-Appointed Receiver for the Insurance Assets of Asbestos Corporation Limited*
101 Park Avenue
New York, NY 10178
By:     Jason R. Alderson, Esq.

– and –

MORGAN LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
By:     Brady Edwards, Esq.

COOLEY LLP
*Counsel for Charles M. Forman, solely in his capacity as the Chapter 7 Trustee for the bankruptcy estate of National Services Industries, Inc.*
55 Hudson Yards
New York, NY 10001
By:     Cullen D. Speckhart
         Michael Klein
         Olya Antle
         Jeremiah P. Ledwidge

SIMPSON THACHER & BARTLETT LLP
*Counsel to Certain Underwriters at Lloyd's, London and certain London market insurance companies*
425 Lexington Avenue
New York, NY 10017
By:     Alan C. Turner, Esq.
         David R. Zylberberg, Esq.

WINDELS MARX LANE & MITTENDORF, LLP
*Counsel to Allstate Insurance Company, solely as successor in interest to Northbrook Excess and Surplus Insurance Company, formerly Northbrook Insurance Company*
One Giralda Farms
Madison, New Jersey 07940
By:     Anthony F. Sirianni, Jr., Esq.

RUGGERI PARKS WEINBERG LLP
*Counsel for First State Insurance Company, Hartford Accident and Indemnity Company and New England Reinsurance Corporation*
1875 K Street NW, Suite 800
Washington, DC 20006
By:    James P. Ruggeri, Esq.
        Joshua D. Weinberg, Esq.
        Annette P. Rolain, Esq.

MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
*Counsel for First State Insurance Company, Hartford Accident and Indemnity Company and New England Reinsurance Corporation*
225 Liberty Street, 36th Floor
New York, NY 10281
By:    Jeffery Bernstein, Esq.

– and –

MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
300 Delaware Avenue, Suite 1014
Wilmington, DE 19801
By:    Gary D. Bressler, Esq.

PARKER, HUDSON, RAINER & DOBBS LLP
*Counsel for the Certain Solvent Non-Resolute London Market Companies*
303 Peachtree Street NE, Suite 3600
Atlanta, Georgia 30308
By:    Harris B. Winsberg, Esq.
        Anna K. MacFarlane, Esq.
        Matthew M. Weiss, Esq.

– and –

STRADLEY RONON STEVENS & YOUNG LLP
100 Park Avenue, Suite 2000
New York, New York 10017
By:    Marc E. Haas, Esq.

WYCHE, P.A.
*Counsel for the Asbestos Parties*
807 Gervais Street Suite 301
Columbia, South Carolina 29201
By:    Matthew T. Richardson, Esq.

– and –

DEAN OMAR BRANHAM SHIRLEY, LLP
1801 N. Lamar, Suite 300
Dallas, Texas 75201
By:    Charles W. Branham, III, Esq.

DAVIS POLK & WARDWELL LLP
*Counsel to General Dynamics Corporation*
450 Lexington Avenue
New York, NY 10017
By:    Frances E. Bivins, Esq.
        James I. McClammy, Esq.
        Darren S. Klein, Esq.

WHITE AND WILLIAMS LLP
*Counsel to Oakwood Insurance Company as successor to Central National Insurance Company of Omaha, but only for policies issued through Cravens Dargan and Company Pacific Coast*
810 Seventh Ave, Suite 500
New York, NY 10019
By:    Jeremiah J. Vandermark, Esq.

      – and –

PLEVIN & TURNER LLP
580 California Street, Suite 1200
San Francisco, California 94104
By:    Mark D. Plevin, Esq.

      – and –

PLEVIN & TURNER LLP
1701 Pennsylvania Ave., N.W., Suite 200
Washington, DC 20006
By:    Miranda H. Turner, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the Foreign Representative's motion ("Motion," ECF Doc. No. 4) for recognition of the Canadian Proceeding (defined *infra*) as a foreign main proceeding for the above-captioned debtor ("Debtor" or "ACL"). The Asbestos Parties (defined *infra*) filed an objection ("Objection," ECF Doc. No. 75) to the Motion, which incorporates by reference the Receiver's Limited Response ("Receiver Response," ECF Doc. No. 23) to the Foreign Representative's earlier motion for interim relief. The Foreign Representative filed a reply ("Reply," ECF Doc. No. 81) in support of its Motion, as did the London Market Insurers (defined *infra*) ("CLMI Reply," ECF Doc. No. 83). The Court held an evidentiary hearing on the Motion on October 8, 2025. This Opinion contains the Court's findings of fact and conclusions of law. *See* FED. R. BANK. P. 7052. For the reasons explained below, the Court concludes that the Foreign Representative has satisfied the requirements of Section 1517(a) and has made a proper showing under Section 1521 to extend the stay to the Stay Parties (defined *infra*). The Court therefore **GRANTS** the Motion in full and **OVERRULES** the Asbestos Parties objection.

## I.    BACKGROUND

### A.  Company Structure and History

ACL is a Québecois corporation, founded in 1925 and incorporated under the laws of Canada. (Declaration of Ayman Chaaban (the "Chaaban Decl."), (ECF Doc. No. 2) ¶ 8.) For sixty years, ACL operated open pit chrysolite mines for the purpose of asbestos mining in Québec. (*Id.* ¶ 15.) Asbestos mined in Québec would be shipped by ACL worldwide. While asbestos mined by ACL would be sold and shipped to the United States, over 90% of total ACL sales occurred outside of the U.S. Recognition Hearing at 3:36:15, *In re Asbestos Corporation Ltd.*, No. 25-10934 (Bankr. S.D.N.Y Oct. 8, 2025).

Mining operations ceased in 1980.  In recent years, ACL has operated the mines on a limited basis for purposes of extracting minerals from tailings, the waste material remaining from the past mining operations.  In addition, ACL continues to manage, restore, lease and redevelop its properties, including various warehouses and other buildings, all of which are in Québec.  (*Id.* ¶ 16).  As of the filing of the Verified Petition on May 6, 2025 (Verified Petition, ECF Doc. No. 1) (the "Petition"), all of ACL directors and officers reside and work in Canada, which is also where all board meetings have been exclusively held. (*Id.* ¶ 12.)  As all senior management work and reside in Canada, it is also here where all operational and strategic decisions are made.  (*Id.* ¶ 11.)  All individuals currently employed by ACL live and work in Canada.  (*Id.* ¶ 20.)

Aside from these operations, ACL's activities have included the management of the thousands of personal injury lawsuits filed against the corporation for injuries resulting from exposure to asbestos fiber connected to ACL.  (*Id.* ¶ 16.)  ACL entered into an Interim Settlement Agreement ("ISA") with Certain London Market Insurers ("CLMI")[1] for managing the costs of defense and judgments related to asbestos claims against ACL. (*Id.* ¶ 27.)  First entered in 1998, the effective term of the ISA has been extended to the current indefinite term. The terms of the ISA effectively extend the "London Policies" as agreed to by ACL's former parent corporation, General Dynamics.[2]  (*Id.* ¶ 27.)   The ISA established an arrangement in

---

[1]    Certain Underwriters at Lloyd's, London, The Scottish Lion Insurance Company Limited, Tenecom Limited (as successor to Winterthur Swiss Insurance Company, formerly known as Accident & Casualty Insurance Company of Winterthur, Switzerland, and to Yasuda Fire and Marine Insurance Company (UK) Limited and now known as Tenecom Limited), The Ocean Marine Insurance Company Limited (as successor to liabilities of Commercial Union Assurance Company Limited, The Edinburgh Assurance Company, The Indemnity Marine Assurance Company Limited, The Northern Assurance Company Limited, The Road Transport & General Insurance Company Limited, United Scottish Insurance Company Limited, and The Victoria Insurance Company Limited), and NRG Victory Reinsurance Limited, as successor to liabilities of New London Reinsurance Company Limited, (collectively, "CLMI").

[2]    The history of the London Policies are explained in further detail in the Chaaban Declaration:
       From 1969 through 1982 General Dynamics held an indirect ownership interest in ACL. During the period from July 1, 1969 through July 1, 1982 (the "Policy Period") certain general liability insurance policies were issued in favor of General Dynamics. Among those were certain excess policies (the "London

which CLMI would reimburse ACL for Defense Costs and Indemnity Payments attributable to

Asbestos-Related Bodily Injury Claims (as defined by the ISA).  (*Id*.)  Thousands of claims have

been settled through this protocol.  Of the more than 50,000 asbestos-related claims initially

brought against ACL, only approximately 6,100 remain.  Approximately 19,000 claims have

been settled under the ISA.  (Asbestos Parties Ex. 83.)

Settlement efforts with the remaining claimants have stalled after the appointment by a

South Carolina Court of Peter Protopapas as the Court-Ordered Receiver (the "Receiver") of

ACL.[3]  Since his appointment in late 2023, the Receiver has accepted service on ACL's behalf in

a number of new asbestos actions, cases in which ACL has declined to retain counsel as they

challenge the Receiver's validity.  (*Id.* ¶ 31.)  ACL, facing increasing number of default

judgments deriving from these proceedings[4] and seeking to consolidate the various claims being

brought against it, and CLMI seeking protection from actions brought directly against the

insurers, initiated insolvency proceedings for ACL under the Companies' Creditors Arrangement

---

Policies") subscribed to severally (not jointly) by CLMI. The London Policies, subject to their terms, conditions and limits of liability, provided defense cost and indemnification reimbursement coverage to General Dynamics and, commencing on April 1, 1973 of the Policy Period, to ACL. The London Policies in effect during the period in which the bodily injury took place are triggered rather than the policies in effect on the date that a claim is asserted. As ACL was an assured or alleged insured from April 1, 1973 through the end of the Policy Period of the London Policies, it remains an insured or alleged insured entity under the London Policies with respect to injuries allegedly occurring during the Policy Period even though it is no longer a subsidiary of General Dynamics.

(Chaaban Decl. ¶ 27 fn. 7.)

[3]    The Judge in South Carolina, Former Chief Justice Toal, oversees the state's asbestos docket and has appointed Mr. Protopapas as receiver for a number of companies defending asbestos related personal injury lawsuits. (*See, e.g.* Daniel Fisher, *Settlements cloud upcoming showdown in S.C. asbestos court,* LEGAL NEWSLINE, (Oct. 10, 2025), https://www.legalnewsline.com/attorneys-and-judges/settlements-cloud-upcoming-showdown-in-s-c-asbestos-court/article_059a3fc3-0ae6-4040-bfd0-73c5a194aaf4.html.)  His appointment by Judge Toal as receiver for other companies has come under question by various courts, both domestically in *Whittaker Clark & Daniels, Inc., v. Brentag AG, et al. (In re Whittaker Clark & Daniels Inc),* --- F.4th ---, 2025 WL 2611753 (3d Cir. 2025), and internationally in *Altrad Investment Authority SAS, et al. v. Protopapas, et al.* [2025] EWHC 2470 (Ch).

[4]    *See, e.g. Kotzerke v. 3M Co*., 2025 WL 1616234 (Wash.Super. Mar. 18, 2025) (where a default judgment against ACL was issued for USD $14,500,000 after it failed to defend a claim brought by a party injured by asbestos fiber allegedly deriving from ACL owned mines).

Act, R.S.C. 1985 in Canada on May 5, 2025 (the "CCAA Proceeding" in the "Canadian Court").

(Chaaban Decl. Ex. 2.)

Soon after filing in the Canadian Court, ACL initiated this Chapter 15 proceeding

seeking: recognition of the CCAA proceeding as a foreign main, or in the alternative, foreign

nonmain proceeding; authorization of the Foreign Representative, on behalf of the Debtor, to

possess and control, and be entrusted with the exclusive control and administration, of all of the

Debtor's U.S. Interests; and to extend the section 362 to ACL, CLMI, Third Party Claim

Administrator Resolute hired by CLMI to handle the U.S. asbestos claims, and former parent

entity General Dynamics (the "Stay Parties"). (Motion at 14). This Court issued a Temporary

Restraining Order ordering a section 362 stay as to ACL and the Stay Parties, recognizing the

Foreign Representative of the Debtor and scheduling a hearing for May 19, 2025 to show why

provisional relief should be extended. (Temporary Restraining Order, ECF Doc. No. 8.) After

the hearing, an order was entered by this Court extending the initial relief until a final

determination is made by this Court with respect to the Petition. (Order Granting Motion for

Provisional Relief, ECF Doc. No. 37.) The Canadian Court granted preliminary relief to ACL

extending the stay of proceedings as to ACL and the Stay Parties on an interim basis as work on

the ultimate reorganization plan continued. (Certified Translation of July 30, 2025 Judgment,

ECF Doc. No. 66-1.) In granting such relief, the Canadian Court overruled an objection

challenging that ACL had continuing operations and maintained assets in Québec, holding that

such arguments "def[ied] logic."[5]  (*Id.* ¶ 76.)

---

[5]       The Canadian court also denied an objection to ACL's COMI as Canada. (Certified Translation of July 30, 2025 Judgment, ¶ 78.) This Court will not defer to this finding in the Court's own analysis as COMI is not a standard of eligibility for filing under the CCAA. Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 9. *See In re Ocean Rig UDW Inc.*, 570 B.R. 687, 702 n.6 (Bankr. S.D.N.Y 2017) (not deferring on the basis of comity to a court in the Cayman Island's determination of COMI as it was not a relevant factor to its ability to file for insolvency in that court).

**B. Asbestos Parties Objection**

The Asbestos Parties[6] object to the recognition of the CCAA proceeding and, if the Court

recognizes the Canadian proceeding, they object to extending the section 362(a) stay to the Stay

Parties.

      1.  <u>The Asbestos Parties Argue that the CCAA Proceeding Should Not Be
Recognized</u>

The Asbestos Parties argue that the CCAA Proceeding is not a foreign main proceeding

under Chapter 15 as ACL's COMI is not in Canada.  *See* 11 U.S.C. § 1502(4) (A foreign main

proceeding is one "pending in the country where the debtor has [its] center of [] main interests.")

While a debtor's COMI is presumed to be the location of the debtor's registered office (11

U.S.C. § 1516(c)), the Asbestos Parties argue that the factors set out in *In re Fairfield Sentry*

*Ltd.*, 714 F.3d 127 (2d Cir. 2013) rebut that presumption to show ACL's COMI is actually

located in the United States.  (Opposition at 6.)

*First*, they argue that ACL's primary assets are in the United States and not in Canada.

While ACL views its primary assets as the residual material from their old mining operation as

well as their real estate holdings, all of which are in Québec (Chaaban Decl. ¶ 15), the Asbestos

Parties believe the true assets are insurance policies underlying the ISA between ACL and

CLMI, which the Opposition contends would produce proceeds in excess of "one billion

dollars."  (Opposition at 7).

*Second*, the Asbestos Parties posit that ACL's true headquarters is in the United States

and not in Canada.  The Debtor asserts that its board of directors and all employees live in and

---

[6]    As defined in the Objection, the "Asbestos Parties" are Charles M. Forman, solely in his capacity as the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of National Services Industries, Inc. ("NSI") in connection with NSI's Chapter 7 bankruptcy case pending in the United States Court for the District of Delaware under case no. 12-12057 (MFW), along with certain individuals with personal injury claims pending against ACL.

work in Canada.  (Chaaban Decl. ¶ 10-13.)  The Asbestos Parties argue that a COMI analysis

requires the court to determine a debtor's headquarters based on the "primary management" of

"all relevant business functions," *In re Brit. Am. Ins. Co. Ltd.*, 425 B.R. 884, 911 (Bankr. S.D.

Fla. 2010).  They argue that ACL's true business function is the management of asbestos-related

litigation.  This litigation, according to the Asbestos Parties, is managed by third-party claims

administrator Resolute in the United States.  (Opposition at 10).

*Third*, according to the Asbestos Parties, the vast majority of creditors affected in the case

are located in the United States—the claimants in asbestos-related injury suits brought against

ACL.  As these claims were filed in various state forums, United States law would apply to their

disputes and their strong preference is to litigate in the United States.  (Opposition at 10-11).

The Asbestos Parties note that the claimants are "involuntary creditors, who never took on the

risk of contracting with a Canadian company."  Due to their exposure to ACL-linked asbestos

fiber, the Asbestos Parties contend, the claimants are facing horrible and oftentimes terminal

diseases and would face further prejudice by being forced to contest their claims in Canada.  (*Id.*

at 12).

Additionally, the Asbestos Parties argue that the CCAA proceeding does not qualify as a

foreign nonmain proceeding as ACL lacks an "establishment" in Canada.  An establishment

requires a showing of "any place of operations where the debtor carries out a non-transitory

economic activity."  11 U.S.C. § 1502(2).  The Asbestos Parties contend that ACL's current

activity in Canada related to residual mining material and real estate holdings are insufficient to

create an "establishment" in Canada.  (Opposition at 13).

10

2. <u>The Asbestos Parties Argue that the Stay Should Not Be Extended to the Stay Parties</u>

Assuming, *arguendo*, that this Court recognizes the CCAA proceeding, the Asbestos Parties argue that the Court should deny extending the stay to the Stay Parties.

*First*, the Asbestos Parties contend that extending the stay to third parties would violate the protections under section 1522, which permits the Court to grant relief only if the interest of creditors is "sufficiently protected." *In re Odebrecht Engenharia e Construcao S.A. - Em Recuperacao Jud.*, 669 B.R. 457, 474 (Bankr. S.D.N.Y. 2025) (citing *In re Atlas Shipping A/S*, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009). The Asbestos Parties argue that forcing sick asbestos creditors to litigate in a Canadian court, which lacks the statutory guardrails available to Asbestos claimants under 11 U.S.C. § 524(g), will lead to unjust distributions not in accordance with the Bankruptcy Code and would insufficiently protect creditors. (Opposition at 15-17.)

*Second*, the Asbestos Parties argue that even if the Court finds the Canadian court affords creditors sufficient protection, the Court cannot extend stay relief as any claim against the Stay Parties would not have "an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003). There would be no irreparable harm to the Bankruptcy Estate if the cases against CLMI, Resolute, or General Dynamics would continue. (Opposition at 18-21.)

*Lastly*, the Asbestos Parties argue extending the stay would be averse to U.S. public policy, a violation of 11 U.S.C. § 1506, as it would in effect be the Court sanctioning the Debtor's past unfair discovery tactics (Opposition at 23-24) and the denial of due process that would befall creditors in a proceeding lacking the protections of section 524(g). (*Id.*)

### C.  Foreign Representative's Reply

The Foreign Representative contests each of the arguments made by the Asbestos Parties in their Objection.  First, the Foreign Representative argues that ACL's COMI is Canada, where it conducts its regular business and is where its management is located.  (Reply at 2-3.)  If this Court did find ACL's COMI is not in Canada, ACL would have an establishment there.  (*Id.* at 5.)  Additionally, the stay should be extended to the Stay Parties; arguing that the Canadian court will not sufficiently protect the Asbestos Parties is premature as this is an issue for when a claims process is ultimately approved by the Canadian court.  (*Id.* at 7-8.)  The only issue before the Court at this stage is whether the Canadian proceeding should be recognized as a foreign main or nonmain proceeding.  Only after the Canadian court has approved a plan is the issue raised whether this Court should recognize and enforce the plan in the United States.  As for the public policy exception, courts have applied the exception narrowly and any application of it here would be well beyond any that has been issued by a court before.  (*Id.* at 10.)

## II.    LEGAL STANDARD

### A.  The Legal Standard for Determining a Debtor's COMI

Chapter 15 of the Bankruptcy Code, enacted in 2005, is based on the UNCITRAL Model Law on Cross-Border Insolvency promulgated by the United Nations Commission on International Trade Law in 1997.  Chapter 15 provides the statutory framework for cases filed in the United States ancillary to a foreign insolvency proceeding.  Chapter 15 offers a bankruptcy court "maximum flexibility" in granting relief to foreign representatives and debtors to ensure comity and cooperation with foreign courts.  *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006).

In order for a court to grant relief under Chapter 15, the court must first recognize the foreign proceeding as either a "foreign main proceeding" or a "foreign nonmain proceeding."[7] 11 U.S.C. § 1517 (a).

The Code defines a foreign main proceeding as "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C § 1502(4). While not defined by the Code, Chapter 15 creates a rebuttable presumption of "the debtor's registered office . . . to be the [debtor's COMI]." 11 U.S.C. § 1516(c); *see also In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008). To determine if the presumption has been overcome, federal courts have focused on a list of non-exclusive factors to determine a debtor's COMI:

> the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*In re Fairfield Sentry Ltd.,* 714 F.3d 127, 137 (2d Cir. 2013) (citing *In re SPhinX, Ltd.*, 351 B.R. at 117). The Court in *SPhinX* warned against mechanically applying the factors, holding that "they should be viewed in light of Chapter 15's emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures and the maximization of the debtor's value." *In re SphinX*, 351 B.R. at 117. Courts are to examine these factors as of the time of filing the

---

[7] 11 U.S.C. § 1517(a) has two other requirements for recognition, both of which are uncontested in this case: . . .
(2) the foreign representative applying for recognition is a person or body; and
(3) the petition meets the requirements of section 1515.

petition, not by examining the historical operations of the debtor. *Fairfield Sentry*, 714 F.3d at 134.

When determining the "location of those who actually manage the debtor," courts are to consider more than just the location of the board of directors of the debtor. Analysis of the location of management is to be somewhat flexible to reflect the realities of management of a particular business. For example,

> The headquarters of a corporate entity is more than the location of its board of directors. The term headquarters, or head office, contemplates the place where the primary management of an entity's business is undertaken. Management of a corporate entity includes all relevant business functions, such as the financial, administrative, marketing, information technology, investment, and legal functions. Other functions may be relevant depending on the nature of the debtor's business. Here, because [the debtor] operated as an insurance company, actuarial tasks, underwriting, and claims adjustment should be considered.

*In re British Am. Ins. Co. Ltd.,* 425 B.R. 884, 911 (Bankr. S.D. Fla. 2010).

In addition to these factors, the reasonable expectation of third parties and creditors should be considered. This includes whether there is any "objective evidence that could provide interested parties with notice that a debtor's COMI was in a particular jurisdiction other than the place of its registered office." *In re Olinda Star Ltd.*, 614 B.R. 28, 44 (Bankr. S.D.N.Y. 2020) (citing *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 274 (Bankr. S.D.N.Y. 2019)). While creditor support can be influential in making a COMI determination, creditor support "only goes so far . . . . [T]he bankruptcy court still has the duty to make its own COMI determination." *In re Sunac China Holdings Ltd.*, 656 B.R. 715, 733 (Bankr. S.D.N.Y. 2024); *see also In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 420 (Bankr. S.D.N.Y. 2014) (finding a COMI despite creditor objections). The "expectation of creditors" factor focuses on "voluntary creditors," not "involuntary creditors." Voluntary creditors can make assessments of

risk before extending credit or making investment decisions; not so for involuntary creditors like the Asbestos Parties who did not know they were exposed to ACL products.

### B.  Foreign Nonmain Proceeding

If the requirements for a foreign main proceeding are not met, a foreign proceeding can still be recognized as a nonmain proceeding if the debtor has an "establishment" in the country, defined as "any place of operations where the debtor carries out a nontransitory economic activity."  11 U.S.C. § 1502.  This requires a showing that the location constitutes "a seat for local business activity of the debtor . . . more than mere incorporation and record-keeping and more than just the maintenance of property."  *In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016) (quoting *Bear Stearns*, 374 B.R. at 131).

### C.  Third Party Relief in a Chapter 15 Proceeding

As noted above, Bankruptcy Courts are afforded broad discretion to grant relief to third parties in the interest of comity and foreign cooperation.  This relief is regularly granted in parallel to relief granted in the recognized foreign proceeding in the name of comity, but courts can refrain from doing so under "unique circumstances."  *In re Cozumel Caribe S.A. de C.V.*, 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012). ("While it is well recognized that comity should be extended in most instances, bankruptcy courts should also have the discretion to deny granting comity to foreign laws, court orders and judgments—consistent with over a hundred years of comity precedent—when unique circumstances warrant it, so long as 'the interests of the creditors . . . are sufficiently protected.'  11 U.S.C. § 1522(a).  Furthermore, courts *must* deny granting comity in exceptional circumstances of fundamental importance, when doing otherwise would be manifestly contrary to the public policy of the United States.") (emphasis in original).

15

Chapter 15 involves a two-step process—in step one, a decision whether to recognize the foreign proceeding as a foreign-main or nonmain proceeding; in step two, *only after a foreign proceeding has been recognized*, a decision whether to recognize and enforce a foreign plan. It is premature to determine whether to recognize and enforce a Canadian plan within the United States unless and until the Canadian Court approves a plan, and certainly before the foreign plan has even been proposed. Recognition of the foreign proceeding in step one does not assure recognition and enforcement of the plan in step two. Recognition of a foreign proceeding does not require a Chapter 15 court to enforce all the relief ordered in a foreign proceeding. *See In re Cozumel Caribe S.A. de C.V.*, 482 B.R. at 113.

"Section 1521(a) outlines the discretionary relief a court may order upon recognition of a foreign proceeding, whether main or non-main . . . . The discretion that is granted is 'exceedingly broad' since a court may grant 'any appropriate relief' that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors." *In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009) (internal citation omitted). Of particular note here is section 1521(a)(7), which allows a bankruptcy court to "grant[] any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)." 11 U.S.C. § 1521(a). In the non-Chapter 15 context, courts have typically granted extensions of a stay to a non-debtor "only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287–88 (2d Cir. 2003); *ZCAP Equity Fund, v. Luxurban Hotels Inc.*, 2025 WL 2939255, at *1 (S.D.N.Y. Oct. 16, 2025) (providing examples of immediate adverse consequences, including "claims against debtor's insurer").

Any action taken by a court under section 1521 must adhere to section 1522(a), which permits bankruptcy courts to grant relief only if the interests of creditors are "sufficiently protected." Sufficient protection is embodied by "three basic principles: 'the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.'" *In re Odebrecht*, 669 B.R. at 474 (citing *In re Atlas Shipping A/S*, 404 B.R. at 741).

Section 1507 provides additional discretionary grounds for the Court to grant relief to the foreign representative. Section 1507 reads:

> (a) Subject to the specific limitations stated elsewhere in this chapter the court, if re cognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States.
> (b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—
>> (1) just treatment of all holders of claims against or interests in the debtor's property;
>> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
>> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
>> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507.

Relief must also comply with section 1506: "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. Also known as the public policy exception, section 1506 has been narrowly construed to ensure claimants are afforded a "fair and impartial proceeding," not that they are afforded all the rights and protections they may

17

receive in an U.S. court.  *See In re Ephedra Prods. Liab. Litig.*, 349 B. R. 333, 337 (S.D.N.Y.

2006) (holding that a foreign proceeding without a jury is not contrary to the public policy of the

United States if the same proceeding in the U.S. has a jury trial right: "the Procedure here in

issue, as amended, plainly affords claimants a fair and impartial proceeding. Nothing more is

required by § 1506 or any other law.")

### III.    DISCUSSION

#### A.  COMI Analysis

The starting point for the COMI analysis is the Debtor's incorporation in Canada, which

creates a rebuttable assumption that the COMI is located there.  11 U.S.C. 1516(c).  As the

Asbestos Parties contest the COMI of the Debtor as Canada, an analysis utilizing in part the

factors cited by the Second Circuit in *Fairfield Sentry* is necessary.  While some factors,

including the location of the creditors and the law that would govern most disputes, suggest a

possible COMI in the United States, the remaining factors clearly indicate that the COMI of the

Debtor is Canada.

#### 1.  ACL Headquarters and Management are Located in Canada

The Foreign Representative contends that the Debtor's current purpose is the continued

extraction of minerals from mines and various energy sources, directed by officers and

employees located in Canada.  (Chaaban Decl. ¶¶ 12-15.)  ACL activities also include the

management of asbestos-related personal injury litigation it is currently facing, management of

which is conducted from Canada.  (*Id.* ¶ 16; Recognition Hearing at 3:39:00, *In re Asbestos

Corporation Ltd.*, No. 25-10934 (Bankr. S.D.N.Y Oct. 8, 2025).)  The Asbestos Parties disagree,

believing that the current business reality of ACL is *solely* the management of asbestos related

litigation, almost all of which is occurring in the United States—where the Asbestos Parties

believe to be ACL's true headquarters—and overseen by Resolute, the CLMI claims administrator. (Opposition at 8-10.) The Asbestos parties contend that ACL has "virtually no ongoing business operations in Canada." (*Id.*)

It is clear that ACL's headquarters are in Canada, specifically in Québec. ACL's executives are located in Canada, its employees live in and work in Canada, it's bank accounts are in Canada, the company owns extensive real estate and mines in Canada, and the company's current projects are focused on extracting minerals from residual mining tailings located in Canada. (Chaaban Decl. ¶ 11-14.) These operations have been ongoing as of the filing date of the Chapter 15 Petition.

The Asbestos Parties argue that the Court should disregard this ongoing business activity in Canada and instead view the ongoing litigation activity in the United States as the primary business activity of ACL. This argument falls flat. For one, the Asbestos Parties have failed to indicate any case law where ongoing litigation against a debtor has alone moved a company's headquarters for the purpose of the COMI analysis when the company maintains a business foothold in its country of incorporation. If we just look to instances when courts have found a COMI to be moved due to the reality of the management of the business, courts have only found COMI to have moved when there has been a near total transfer of the business. *See In re British Am. Ins. Co.,* 425 B.R. at 911 ("In 2005, long prior to the commencement of the Bahamas Proceeding, BAICO entered into the Services Agreement with BA Management, a wholly-owned subsidiary of BAICO located in Trinidad. Under the Services Agreement, BAICO *outsourced essentially all of its central management to BA Management.*") (emphasis added); *In re Ran*, 390 B.R. 257, 301 (Bankr. S.D. Tex. 2008), *aff'd sub nom. Lavie v. Ran*, 406 B.R. 277 (S.D. Tex. 2009), *aff'd sub nom. In re Ran*, 607 F.3d 1017 (5th Cir. 2010) (finding that the

individual, a citizen of Israel, had his COMI in the United States after he moved to the U.S. and has "maintained his personal and occupational ties since 1997"). That just has not happened here; ACL as of the filing of the Petition continues to have substantial operations in Canada.

The Asbestos Parties contention that ACL is managed in the United States through Resolute is also unpersuasive. ACL relies on Canadian counsel to recommend U.S. based attorneys to litigate new claims served on the Debtor, manages the litigation strategy with Canadian counsel from Canada, and has directed the U.S. counsel who appear before the various state courts in ACL's defense. (Chaaban Supp. Decl., ECF Doc. No. 67 ¶ 7.) The chairman of ACL's board of directors is responsible for managing the ongoing defense of asbestos claims, and the debtor employs two administrative assistants to help manage the claims. All three individuals reside in Canada. (*Id.* ¶¶ 8-9.) Prior to the appointment of the Receiver by the South Carolina Court, Resolute's role had largely been to review and approve quarterly billing submitted by ACL for litigation expenses to ensure allocation from CLMI was consistent with the ISA. (Ryan Decl. ECF Doc. No. 68 ¶¶ 9-13). The Receiver's appointment in 2023 has complicated Resolute's role in the case, but that role has not included the management of the claims.

After the receiver's appointment *both* ACL and the receiver have attempted to manage the ongoing litigation and Resolute has been "torn between two masters." (*Id.* ¶¶ 19-20.) CLMI and Resolute were often caught between a Receiver who had accepted service on behalf of ACL, and ACL management, who contest that the Receiver could accept service on ACL's behalf, declining to hire defense counsel to defend the claims. In these instances, Resolute has hired defense counsel when necessary to stem liabilities that would befall CLMI that would otherwise come from default judgments or through sanctions. Recognition Hearing at 30:39, *In re Asbestos*

*Corporation Ltd.*, No. 25-10934 (Bankr. S.D.N.Y. Oct. 9, 2025) (where Thomas Ryan, CEO of

Resolute, recounts that after the appointment of the Receiver there were instances where neither

ACL nor the Receiver would hire defense counsel to "protect ACL interests"). Yet even during

this period, Resolute has continued to act under the ultimate management of ACL, as evidenced

in a California asbestos case where ACL did not approve of Resolute's proposed counsel. That

counsel was not hired. *Id.* at 1:09:22.

        2.  <u>ACL Has Tangible Assets in Canada and Intangible Assets That Are Likely to
be Administered in Canada.</u>

The Debtor has two distinct sets of assets—the tangible assets related to the company's

former mining operations, all of which are located in Canada, and the insurance policies backed

by CLMI that make up the ISA. While the Debtor might believe that its tangible assets in

Canada, including the residual tailings from asbestos mining, are the Company's 'primary

assets,' it cannot be disputed that the insurance policies which have already reimbursed more

than USD $90 million in indemnity and defense costs are ACL's primary assets.[8] (Ryan Decl. ¶

13.) It is a fear of exhausting the insurance assets that has driven ACL and CLMI to the CCAA

Proceeding to consolidate the ongoing asbestos litigation in the United States.

The location of intangible assets is highly context specific. "[A]s Judge Cardozo

observed, determination of [an intangible asset's] situs for one purpose has no necessary bearing

on its determination for another purpose," but rather depends on "considerations of 'justice and

convenience in particular conditions.'" *In re Sunac China Holdings Ltd.*, 656 B.R. 715, 728

(Bankr. S.D.N.Y. 2024) (quoting *Bankers Trust Co. v. Equitable Life Assur. Soc.*, 19 N.Y.2d

---

[8]      Courts have regularly found that a debtor's insurance coverage is property of the bankruptcy estate. *See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 92 (2d Cir. 1988)*; In re MF Glob. Holdings Ltd.*, 515 B.R. 193, 202 (Bankr. S.D.N.Y. 2014); *In re Diocese of Buffalo, N.Y.*, 626 B.R. 866, 869 (Bankr. W.D.N.Y. 2021).

552, 556-57, 281 N.Y.S.2d 57, 227 N.E.2d 863 (1967); *Severnoe Sec. Corp. v. London & Lancashire Ins. Co.*, 255 N.Y. 120, 123-24, 174 N.E. 299 (1931) (Cardozo, C.J.)).  Just because a court had previously determined the insurance policies to be based in the United States for that proceeding, as a South Carolina court had in *Tibbs v. 3M Co.*, Case No. 2023-CP-40-01759 (S.C. Ct. Common Pleas, 5th Cir. Sept. 7, 2023), does not determine their location for the purpose of this COMI analysis.

As the court recently discussed in *Sunac*, a court's consideration of the location of intangible assets for determining COMI should be "guided by pragmatic considerations affecting the Debtors' cases, such as which countries' courts are likely to be involved in liquidating or administering the debtor's assets."  *In re Sunac.*, 656 B.R. at 728 (citing *In re SPhinX*, 351 B.R. at 119).  As of the filing of the Chapter 15 petition, the CCAA Proceeding had commenced in Canada to consolidate the more than 6,000 ongoing asbestos-injury claims into a single forum to identify and review the claims under the supervision of the Canadian Court.  (Petition ¶¶ 31-32.) While there are asbestos cases currently ongoing in the United States against ACL, these cases are proceeding slowly through the courts with most of the 6,000 remaining claims being filed before 2005 (Recognition Hearing at 34:15, *In re Asbestos Corporation Ltd.*, No. 25-10934 (Bankr. S.D.N.Y. Oct. 8, 2025)).  With the current posture of the cases, the Court cannot say that these policies are located in the U.S. for purposes of a COMI determination as it is more than likely that the CCAA Proceeding in Canada will lead to the administering of these policies, not U.S. court decisions on a one-off basis.  At best you can say that the insurance claims are located in both Canada and the U.S. and that this factor is a wash.

3. <u>The Creditors Are Located in the United States and United States Law Would Apply to Their Disputes.</u>

It is unopposed that the vast majority of creditors are asbestos injury claimants based in the United States with ongoing cases in various state courts. (*See* Chaaban Decl. Ex. 2 ¶ 2.46; Opposition at 10.)

4. <u>The Asbestos Parties "Expectation" that ACL's COMI is in the United States Should be Discounted Since They Are Involuntary Creditors</u>

The Asbestos Parties argue their preference is against a determination of ACL's COMI being Canada. They note that the majority of creditors are United States based claimants and a forum in Canada to resolve their claims would be "contrary to their expressed preferences and obvious expectations to have the courts in which they filed their claims decide those claims." (Opposition at 11.)

A court is to examine creditor expectation for COMI analysis to determine if the place of regular business was not ascertainable to third parties. *In re British Am.*, 425 B.R. at 912 ("The relevant principle . . . is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable to third parties.") In conducting this examination, a court often looks to public documents and filings of a debtor to see if a third party could ascertain the debtor's supposed COMI *when contracting with the entity. See In re Oi Brasil Holdings Cooperatief U.A*, 578 B.R. 169, 228 (Bankr. S.D.N.Y 2017) (in setting the bounds for an examination of creditor expectations, the court said that expectations should "be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments") *Id.* at 228; *In re OAS S.A.*, 533 B.R. 83, 102-03 (Bankr. S.D.N.Y 2015) (focusing on language in offering memoranda listing "Risk Factors" that would lead creditors to conclude they were investing in a Brazilian based business).

The Court recognizes that the Asbestos Parties are claimants suffering from awful, painful, and oftentimes fatal diseases. But when considering creditor expectations, courts have routinely looked to the expectations of *voluntary* creditors through public documents and financial filings, rather than expectations of involuntary creditors in similar situations as the Asbestos Parties. The Asbestos Parties claim that, as involuntary creditors who "never took on the risk of contracting with a Canadian company," the claimants never had a "legitimate expectation that the [foreign] courts would play any role in the determination or payment of their claims." (Opposition at 11 (citing *In re OAS S.A.*, 533 B.R. 83, 103 (Bankr. S.D.N.Y. 2015).) This might be true, but it is ultimately not what this analysis entails, which is whether a creditor would have a "legitimate expectation" of a restructuring occurring in the forum *upon contracting* with the debtor.

If we consider the expectations of potential voluntary creditors of ACL, there is nothing in the record to suggest from ACL's public filings that it was not a Canadian Company. While ACL's public financial statements note that the ongoing asbestos-related litigation raises a "Going Concern" qualification, its public filings also indicate that ACL is governed by Canadian Business Corporations Act; it's stock traded on a Toronto stock exchange; it continues to own and operate property in Canada; and that it plans to expand the business in Canada through the continuation of partnerships and upgrading its tailings operations. (Foreign Rep. Ex. 37-a). This information would be sufficient for a creditor contracting with ACL to expect any future insolvency proceeding to occur in Canada.

The Court is concerned that the Asbestos Parties' objection to a COMI finding of Canada furthers the interests of a small number of tort creditors that can win the "race to the courthouse" to obtain and collect big judgments against ACL, depleting its insurance, rather than ensuring

that ACL's Canadian reorganization proceeding will provide equality of distributions for all similarly situated creditors.  As there is not a plan currently in place in Canada, there is no indication of how the ultimate distribution to the more than 6,000 potential creditors will ultimately play out.  The Foreign Representative testified that the current scattershot approach means that judgments in a small number of cases threaten to deplete insurance funds and reserves at ACL at a rate that will leave the Debtor unable to pay judgments to remaining creditors.  Recognition Hearing at 2:42:15, *In re Asbestos Corporation Ltd.*, No. 25-10934 (Bankr. S.D.N.Y. Oct. 8, 2025).  If a handful of asbestos claimants win the "race to the courthouse," the risk that the insurance coverage (with its many gaps because of insolvent insurers) will be depleted, leaving many asbestos claimants with no likely source of recovery.  Bankruptcy proceedings in Canada, time and again found to conform to high standards of due process, are intended to safeguard equality of distribution to creditors of the same class.

Ultimately the Asbestos parties have failed to demonstrate that the COMI presumption of the debtor's place of incorporation has been rebutted.  The Debtor's COMI, as evidenced through the analysis above, is in Canada and the CCAA proceeding is recognized as a foreign main proceeding under Section 1517(a).

### B.  ACL Has an Establishment in Canada

While a finding of establishment in Canada is not necessary if ACL has its COMI in Canada, as the Court has found, ACL does have an establishment in Canada sufficient for a finding of a foreign nonmain proceeding under section 1517(a).  ACL and it's direct subsidiaries own and operate mines in Canada.  Affiliate connections have been enough for courts to find establishment for the parent even when the parent does not have ongoing business connections, which ACL has here.  *See e.g., In re Servicos de Petroleo Constellation*, 600 B.R. at 281–82

25

("[A]ll of its subsidiaries have substantial and ongoing business connections in Brazil. These non-transitory ties to Brazil are sufficient to recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to Parent/Constellation.")

### C. Granting Additional Relief to the Stay Parties

1. <u>Granting Relief Does Not Run Afoul of Section 1522(a)</u>

The Canadian Court has stayed proceedings against the Stay Parties: issuing an initial stay on May 15, 2025 through September 5, 2025 (Amended and Restated Initial Order, ECF Doc. No. 32-1, ¶ 18) and then extending the stay on September 4, 2025 through December 15, 2025 (Second Amended and Restated Initial Order, ECF Doc. No. 88-2, ¶ 15).

In examining if parallel relief under section 1521(a)(7) should be extended, the Court finds that the Debtor's estate will suffer "immediate adverse consequences" if the stay is not extended to the Stay Parties. As indicated during testimony at the Recognition Hearing, the ISA is operated as a "stack," where a portion of every claim brought against ACL is paid for by a specific insurer. If any insurers are unable to pay for their designated portion of the stack due to insolvency, ACL is to cover that portion of the claim themselves. Recognition Hearing at 2:42:15, *In re Asbestos Corporation Ltd.*, No. 25-10934 (Bankr. S.D.N.Y. Oct. 8, 2025). As of the filing of the Voluntary Petition, approximately 20% of the underlying insurance providers to the ISA are insolvent, meaning that ACL must cover that portion of defense and judgment costs. ACL will be unable to cover amounts in excess of the approximately CAD $25 million Canadian currently in their trust account. *Id.* If claims were allowed to proceed against CLMI, Resolute, (Petition ¶ 69) or be brought against General Dynamics,[9] insurers would risk insolvency,

---

[9] While proceedings have not yet commenced against General Dynamics, there is rightful concern that without a stay the claimants will go after General Dynamics to recover against the same insurance policies that would otherwise apply to ACL. (*Statement of General Dynamics in Support of the Verified Petition,* ECF Doc. No. 85, ¶ 18.)

ultimately lessening the pool of assets available for the remaining creditors to collect during the CCAA Proceeding.

The Asbestos Parties claim that despite the economic consequences that would occur through not extending the stay, this is a "unique circumstance" where comity should not be extended to the CCAA Proceeding determination. They argue that the Court should follow *In re Maschinbau*, 664 B.R. 863 (Bankr. N.D. Ga. 2024), *aff'd sub nom. Kiener Maschinenbau GmbH v. Bass*, No. 1:24-CV-4462-TWT, 2025 WL 2674557 (N.D. Ga. Sept. 18, 2025), which declined to extend a stay to a third-party insurance carrier in a Chapter 15 proceeding.

Yet the Asbestos Parties claims against ACL hold important distinctions with the claim in *Maschinbau*, most importantly in number of claims at issue. In *Mashcinbau*, there was a single claimant challenging the stay to the insurer. Given the relative insignificance of the claim to the overall bankruptcy estate, the court found that not extending the stay to the insurance carrier was unlikely to prejudice the Chapter 15 proceeding to any great effect. *Id.,* at 876-77. In this case, as noted above, there is a high likelihood of prejudice to ACL if U.S. litigation were able to continue against CLMI, Resolute, and General Dynamics. Claims that were to continue against any of the Stay Parties would imperil the insurance stack underlying the ISA and limit future recovery for the remaining claimants from a plan devised in the CCAA Proceeding.

The Asbestos Parties also contend relief to the Stay Parties should be denied under section 1522(a). The Asbestos Parties claim they will not be "sufficiently protected" in the CCAA Proceeding as Canadian courts lack the protections creditors are afforded in the Bankruptcy Code, specifically under 11 U.S.C. § 524(g). Section 524(g) was enacted by Congress to address problems inherent with an asbestos-related bankruptcy of claimants not knowing they have a claim once symptoms develop years after reorganization:

"Section 524(g) addresses this difficulty by authorizing a bankruptcy court to enter, along with confirmation of a reorganization plan, an injunction 'channeling' certain classes of claims to a trust set up in accordance with the reorganization plan, which trust will then make payments to both present and future claimants." *In re Quigley Co., Inc.*, 676 F.3d 45, 58 (2d Cir. 2012).

While no provision similar to section 524(g) exists under Canadian law, the Asbestos Parties' claim here is premature. At issue before this Court is solely the *recognition* of CCAA Proceeding and whether the stay should be extended in parallel with the order from the Canadian Court. A plan has not yet been proposed or considered by the Canadian Court. What the Asbestos Parties are asking this Court to do is judge a *hypothetical* plan on its *potential* lack of protections. There is nothing in the record to suggest that the exact protections, or even *better* protections, will not be put in place in a plan confirmed by the Canadian Court.[10] There are a number of protections within the CCAA Proceeding absent in Chapter 11, chief among which is the Monitor, the independent officer appointed by the Canadian Court to provide objective oversight and ensure the restructuring is fair and impartial to all stakeholders.[11] (Reply Decl. of Alain N. Tardif, ECF Doc. No. 82, ¶ 3.) Any worries of substantial unfairness due to a plan far from fruition are unfounded, especially given the history of Canadian courts affording creditors "a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process. U.S. federal courts have repeatedly granted comity to Canadian proceedings." *In re*

---

[10]     The Opposition is correct to point out that section 524(g) effectively codified the procedures first adopted by the court in the *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89 (2d Cir. 1988) asbestos bankruptcy. (Opposition at 16). There is nothing stopping the Canadian Court, armed with even more ability to be creative through the CCAA than a U.S. court within Chapter 11, from enacting a plan with better protections than the court in *Johns-Manville*. The CCAA grants judges broad discretion to "make a variety of orders that respond to the circumstances of each case and meet contemporary business and social needs." *9354-9186 Québec inc. v. Callidus Capital Corp.*, [2020] SCC 48 (Can.).

[11]     There is also no issue of this Court later approving a plan that conflicts with *Harrington v. Purdue Pharma*, 603 U.S. 204 (2024) by issuing non-consensual third-party releases in favor of setting insurers. In the U.S., section 524(g) expressly permits third party releases in asbestos cases. Third-party releases are permissible in Canada. *See In re Sino–Forest Corp.*, 501 B.R. at 663 (citing *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 698).

*Sino–Forest Corp.*, 501 B.R. 655, 663 (Bankr. S.D.N.Y. 2013) (citing *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 698 (Bankr. S.D.N.Y. 2010)); *see also In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 212 (S.D.N.Y. 2002) ("There is no question that bankruptcy proceedings in Canada—a sister common law jurisdiction with procedures akin to our own—are entitled to comity under appropriate circumstances.") (internal quotation marks and citations omitted); *Tradewell, Inc. v. American Sensors Elecs., Inc.*, No. 96 Civ. 2474 (DAB), 1997 WL 423075, at *1 n.3 (S.D.N.Y. 1997) ("It is well-settled in actions commenced in New York that judgments of the Canadian courts are to be given effect under principles of comity.") (internal quotation marks and citation omitted); *Cornfeld v. Investors Overseas Servs., Ltd.*, 471 F. Supp. 1255, 1259 (S.D.N.Y. 1979) ("The fact that the foreign country involved is Canada is significant. It is well-settled in New York that the judgments of the Canadian courts are to be given effect under principles of comity. Trustees in bankruptcy appointed by Canadian courts have been recognized in actions commenced in the United States. More importantly, Canada is a sister common law jurisdiction with procedures akin to our own, and thus there need be no concern over the adequacy of the procedural safeguards of Canadian proceedings.") (internal quotation marks and citations omitted). Issues regarding prejudice to claimants for being forced to defend their claims in Canada are unfounded. A plan could offer the Asbestos Parties many opportunities to ensure they are sufficiently protected. These are all questions to be asked once the plan is approved in Canada and recognition and enforcement is sought in the U.S.

### 2. Granting Relief Does Not Run Afoul of Section 1506

The Asbestos Parties argue that the CCAA proceeding violate section 1506 as contrary to

U.S. public policy.[12]  The public policy exception has been construed as extraordinarily narrow,

applying only to instances that implicate the "most fundamental policies of the United States."

*In re Ephedra*, 349 B.R. at 336 (citing H.R.Rep. No. 109–31(I), at 109, *as reprinted in* 2005

U.S.C.C.A.N. 88, 172).  In *Ephedra*, the court found that the denial of a jury trial in a Canadian

proceeding was not contrary to U.S. public policy when in other manners the Canadian court

offered "claimants a fair and impartial procedure."  *In re Ephedra*, 349 B.R. at 337.  So too is it

the case that the lack of a guarantee of section 524(g) protections fails to meet the public policy

exception.  Not only is it far from certain at this stage that these protections will not be afforded

to asbestos claimants in an ultimate plan, but a lack of section 524(g) guarantees in the ultimate

plan will still not doom a plan under section 1506.

### IV.    CONCLUSION

For the foregoing reasons, this Court finds and concludes that ACL's COMI is in Canada.

The Asbestos Parties' objections are **OVERRULED**.  ACL's CCAA Proceeding in Canada is

recognized as a foreign main proceeding.

**IT IS SO ORDERED.**

Dated:    October 29, 2025
          New York, New York

_Martin Glenn_
MARTIN GLENN
Chief United States Bankruptcy Judge

---

[12]    The Asbestos Parties briefed an issue about the Debtor's discovery, including a failure to allow the Asbestos Parties to see the ISA or other relevant insurance policies.  The ISA has now been provided to the Asbestos Parties thus mooting this issue.